795 F.2d 538
 FORD MOTOR COMPANY, Plaintiff/Counter-Defendant/Appellee,
v.
TRANSPORT INDEMNITY COMPANY, Defendant/Counter-Plaintiff/Appellant,
v.
AUTOMOBILE TRANSPORT, INC., Alexander Andrews, Trustee in
Bankruptcy of Automobile Transport, Inc.,
Additional Defendants on
Counterclaim/Appellees. (84-1735).
In re AUTOMOBILE TRANSPORT, INC., Debtor,
Alexander G. ANDREWS, Plaintiff-Trustee for Automobile
Transport, Inc., Plaintiff/Counter-Defendant/Appellee,
v.
FORD MOTOR COMPANY, Defendant/Counter-Plaintiff/Appellee. (85-1341).
 Nos. 84-1735, 85-1341.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 23, 1986.
Decided June 30, 1986.
 
 Gromek, Bendure & Thomas, Detroit, Mich., Daniel J. Wright, Edward Farman (argued), New York City, for defendant/counter-plaintiff/appellant.
 George E. Ward (argued), Kaufman, Roche & Ward, Detroit, Mich., for plaintiff/counter-defendant/appellee.
 Before CONTIE and MILBURN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 CELEBREZZE, Senior Circuit Judge.
 
 
 1
 Defendant-appellant Transport Indemnity Company (TICO) appeals from the district court's decisions granting summary judgment in favor of plaintiff-appellee Ford Motor Company (Ford), 41 B.R. 433. On appeal, TICO contends that the district court lacked subject matter jurisdiction over the action, incorrectly held that the processing of damage claims by Automobile Transport, Incorporated (ATI) created a prima facie case of liability against TICO, erred in classifying TICO's defenses as affirmative defenses, and improperly concluded that no issues of material of fact existed. For the reasons which follow, we reverse.
 
 
 2
 I. Background.
 
 
 3
 The facts of this case are largely straight forward and undisputed. ATI, a Michigan corporation, engaged in the transportation of automobiles in interstate commerce. Pursuant to regulations promulgated by the Interstate Commerce Commission (ICC), see 49 U.S.C. Sec. 10927(a)(3)(1982); 49 C.F.R. Sec. 1043.1(b) (1985), ATI entered into a contract of liability insurance with TICO which was effective from April 1975 to February 1979 and from September 1979 to January of 1980.[1] The insurance policy included an ICC prescribed form B.M.C. 32 endorsement, 49 C.F.R. Sec. 1003.3 (1985).[2] This endorsement provided that liability for any goods damaged while in transit flowed directly from the injured shipper to TICO.
 
 
 4
 While TICO's insurance policy was in effect, ATI was under contract to transport cars for Ford. The contract obligated ATI to ship newly manufactured cars from Ford's assembly plants to Ford's dealerships. The shipping contract, however, was not exclusive; ATI often transported the cars only through a portion of their journey, with rail or other motor carriers completing the trip.
 
 
 5
 Claims by Ford for cars that were damaged while in transport were handled in accordance with ICC regulations. See 49 C.F.R. Secs. 1005.1-.7(1985). Ford initiated the process by filing a written claim with ATI. 49 C.F.R. Sec. 1005.2(b) (1985). ATI then had to acknowledge receipt of the claim within thirty days, 49 C.F.R. Sec. 1005.3(a) (1985), and conduct a prompt investigation, 49 C.F.R. Sec. 1005.4(a)(1985). Within 120 days of receipt, ATI had to either deny the claim, pay the claim, or make a firm settlement offer. 49 C.F.R. Sec. 1005.5(a)(1985). As to the claims involving the transportation of a damaged auto by multiple carriers, ATI had entered into agreements with the other carriers to apportion the damage claims (the "pro rata agreements").
 
 
 6
 Sometime in 1976, ATI began to experience financial difficulties. To help ATI alleviate its cash flow problems, Ford and ATI entered into a new agreement concerning the payment of Ford's damage claims. The new agreement provided that ATI would continue to process the damage claims submitted by Ford but only send Ford copies of checks as payment; the originals would be forwarded when sufficient funds became available. Apparently, this agreement was insufficient to remedy ATI's financial problems and in January, 1980 ATI filed a petition for reorganization under Chapter 11 of the Bankruptcy Act. ATI's filing for bankruptcy sparked the beginning of over six years of litigation in the bankruptcy and district courts.
 
 
 7
 Ford instituted a suit against TICO in United States District Court on October 21, 1980, alleging that TICO was liable to Ford for the unpaid damage claims based upon the B.M.C. 32 endorsement. On November 18, 1980, TICO filed a petition to remove Ford's action to bankruptcy court. See Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, Sec. 241(a), 92 Stat. 2549, 2670. Two days later, TICO filed an answer containing several affirmative defenses, including that ATI was a necessary party to the action. See Fed.R.Civ.P. 19(a). On the same day, TICO also instituted a separate adversary proceeding in bankruptcy court against Ford and ATI. TICO's filings evoked two reciprocal motions by Ford in bankruptcy court: Ford moved to remand the action back to district court, see Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, Sec. 241(a), 92 Stat. 2549, 2668-69, and asked that TICO's adversary bankruptcy court proceeding be dismissed. Following a hearing on Ford's motions, the bankruptcy judge granted Ford's motion to remand the action to the district court, but indicated that he would consider a motion by TICO to lift the automatic stay to permit the joining of ATI to the district court proceedings. As to Ford's motion to dismiss TICO's adversary proceeding, the bankruptcy judge, although denying the motion, entered an order abstaining from jurisdiction. In accordance with the bankruptcy judge's suggestion, TICO then filed a motion to modify the automatic stay. See 11 U.S.C. Sec. 362(d)(1982). The motion was granted and ATI was made a party to the district court proceedings.
 
 
 8
 Meanwhile, in December 1981, ATI instituted an adversary proceeding in bankruptcy court against Ford for unpaid freight charges. Ford answered, filed a counterclaim for set-off against ATI's unpaid damage claims, and moved for a consolidation of the adversary action with the district court proceedings. With the concurrence of all the parties, Ford's counterclaim for set-off was remanded and consolidated with the district court proceedings. The parties thus assumed their present posture and began with the actual litigation of their claims.
 
 
 9
 After remand, TICO filed an amended counterclaim and third-party complaint containing three counts. In the first count, TICO asserted that due to Ford's and ATI's conspiracy to maximize its liability on the B.M.C. 32 endorsement by entering into the new damage claim agreement it was entitled to exoneration of its surety status. Concomitantly, count two asked for rescission of the insurance policy because of ATI's failure to inform TICO of its new arrangement with Ford. The final count requested that if TICO was held liable to Ford any such liability should be set-off against Ford's unpaid freight charges.
 
 
 10
 In February, 1984, Ford moved for partial summary judgment, attaching an affidavit of James R. Gould. Gould averred that Ford had filed $2,381,045.55 worth of damage claims with ATI while TICO's insurance policy was in effect and that ATI had processed and approved $1,725,351.99[3] of these claims (the "processed claims"). The remaining $655,693.56 worth of claims evidently were never processed by ATI (the "unprocessed claims"). In its reply, TICO did not dispute Gould's calculations, but instead raised three defenses for the first time: it was not liable for those claims which fell outside the coverage of the B.M.C. 32 endorsement, which Ford had failed to file with ATI within the nine month period prescribed by the Uniform Straight Bill of Lading, see 49 C.F.R. Secs. 1035.1, 1035.2(1985), and which other carriers were liable for under the pro rata agreements. In addition, TICO for the first time after over three years of litigation questioned whether the district court had subject matter jurisdiction over the action.[4] See Fed.R.Civ.P. 12(b)(1).
 
 
 11
 The district court issued a memorandum opinion granting Ford's motion for summary judgment "in full." The district court first rejected TICO's contention that it lacked subject matter jurisdiction. Four separate bases of subject matter jurisdiction were cited by the district court: diversity of jurisdiction existed between Ford, a Delaware corporation, and TICO, a California corporation, 28 U.S.C. Sec. 1332(1982); the interpretation of the B.M.C. 32 endorsement presented a federal question, 28 U.S.C. Sec. 1331 (1982); Ford's claim on the B.M.C. 32 endorsement was an action on a bond executed under federal law, 28 U.S.C. Sec. 1352 (1982); and the case arose under Section 10927, 49 U.S.C. Sec. 10927 (1982), a federal statute regulating commerce, 28 U.S.C. Sec. 1337(a)(1982). On the merits, the district court initially held that ATI's processing of the claims created a prima facie case of liability against TICO. Next, the district court concluded that no issues of material fact existed concerning TICO's liability since TICO's defenses were "affirmative defenses" which had been waived by TICO's waiting three-and-one-half years to raise them. See Fed.R.Civ.P. 8(c). The district court, accordingly, granted Ford's motion for summary judgment on the processed claims, ordered that Ford's unpaid freight charges be set-off against Ford's judgment, and directed the parties to verify the amount of unprocessed claims.
 
 
 12
 Ford and ATI, however, were unable to agree on how to verify the remaining claims. Consequently, Ford filed a motion for summary judgment on the unprocessed claims to which TICO responded. In December, 1984, the district court judge issued a memorandum opinion which applied bankruptcy law by analogy, see 11 U.S.C.A. Sec. 502(b) (West Supp.1986), and held that TICO was liable to Ford in the amount of $524,555.00.[5] The district court further determined that TICO was entitled to a set-off against Ford's unpaid freight charges. Accordingly, a judgment was issued April 1, 1985, which provided that TICO was liable to Ford for $2,232,761.73[6] in damage claims, set off $426,213.83 in unpaid freight charges against the $2,232,761.73, and ordered pre-judgment interest. This appeal ensued.
 
 
 13
 II. Appellate Jurisdiction.
 
 
 14
 Before addressing the merits of TICO's contentions, we must first consider an issue which this Court raised sua sponte at oral argument, that is, whether the district court's orders constituted a final decision. TICO in its amended counterclaim and third-party complaint alleged that it was entitled to exoneration of its surety status against both Ford and ATI and that, as against ATI, it was entitled to rescission of the insurance policy. Both claims were premised on TICO's allegation that Ford and ATI had conspired to defraud TICO by secretly allowing a continual build up of unpaid damage claims subject to the B.M.C. 32 endorsement. The district court failed in either of its opinions to address these counterclaims.
 
 
 15
 This Court has jurisdiction over "final decisions" of district courts. 28 U.S.C. Sec. 1291 (1982). A decision is final when it "terminate[s] the litigation between the parties on the merits of the case, so that if there should be an affirmance here, the court below would have nothing to do but to execute the judgment or decree it had already rendered." Bostwick v. Brinkerhoff, 106 U.S. (16 Otto) 3, 3-4, 1 S.Ct. 15, 16, 27 L.Ed. 73 (1882); Donovan v. Hayden, Stone, Inc., 434 F.2d 619, 620 (6th Cir.1970) (per curiam). Yet, "final" must not be construed in a "strict and technical sense," but must be given a "reasonable construction." Forgay v. Conrad, 47 U.S. (6 How.) 200, 203, 12 L.Ed. 404 (1848); see Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962). Thus, a district court judge "does not in words [have to] elaborate on every theory presented by counsel." General Time Corp. v. Padua Alarm Systems, Inc., 199 F.2d 351, 358 (2d Cir.1952) (per curiam), cert. denied, 345 U.S. 917, 73 S.Ct. 728, 97 L.Ed. 1351 (1953). If the district court's ruling on one claim necessarily precludes an alternative or mutually exclusive claim, a final order will arise despite the lack of an explicit declaration by the district court. Joseph E. Bennett Co. v. Trio Industries, Inc., 306 F.2d 546, 548 (1st Cir.1962); General Time, 199 F.2d at 358. Although the district court never explicitly ruled on TICO's counterclaims, we are persuaded that the district court rulings rejected these counterclaims.
 
 
 16
 Ford in its motion for summary judgment on the processed claims addressed TICO's claims for rescission and exoneration and argued that they were meritless both as a matter of fact and law. TICO did not respond to this aspect of Ford's summary judgment motion in any manner. In this context, we conclude that the district court's granting of Ford's motion for summary judgment "in full" subsumed an acceptance of Ford's undisputed position that TICO's counterclaims were meritless. Moreover, we hold in the alternative that the district court's finding of liability based upon the B.M.C. 32 endorsement necessarily and implicitly rejected TICO's exoneration and rescission claims. The theory of TICO's being liable to Ford based on the B.M.C. 32 endorsement and the theory that Ford and ATI defrauded TICO are mutually exclusive: if the insurance policy was obtained by fraud, it is unenforceable; on the other hand, if the B.M.C. 32 endorsement, which was part of the insurance policy, is valid, the insurance policy must not have been tainted by fraud. The district court's decisions in this case, accordingly, constitute a final appealable order and we next consider the district court's holding that it had subject matter jurisdiction over this action.
 
 
 17
 III. Subject Matter Jurisdiction.
 
 
 18
 Although the district court concluded that four separate bases for jurisdiction existed, we address only its holding that this case arose under an act of Congress regulating commerce. Section 1337(a), 28 U.S.C. Sec. 1337(a) (1982), provides that district courts shall have original jurisdiction over civil actions "arising under" an "Act of Congress regulating commerce." "Arising under" for purposes of Section 1337(a) is interpreted similarly to the analogous "arising under" language in Section 1331, 28 U.S.C. Sec. 1331 (1982). See Peyton v. Railway Express Agency, Inc., 316 U.S. 350, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942) (per curiam); Michigan Savings & Loan League v. Francis, 683 F.2d 957, 960 n.6 (6th Cir.1982). An action will arise under a statute regulating commerce, therefore, if a federal right created by the statute is essential to the cause of action. See, e.g., Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983); Gully v. First National Bank in Meridian, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). The B.M.C. 32 endorsement at issue was promulgated by the ICC pursuant to Section 10927(a)(3). See 49 C.F.R. Sec. 1043.1(b)(1985). Since Section 10927(a)(3) as part of the Interstate Commerce Act is clearly an "Act of Congress regulating commerce" and since Ford is suing TICO based on the B.M.C. 32 endorsement, this case "arises under" an act of Congress regulating commerce. TICO does not take issue with this "arising under" analysis, but rather argues that finding jurisdiction in this manner would circumvent a recent Congressional limitation placed upon actions brought under the "Carmack Amendment," 49 U.S.C. Sec. 11707 (1982).
 
 
 19
 The Carmack Amendment requires a common carrier subject to the jurisdiction of the ICC, see 49 U.S.C. Sec. 10521 (1982), to issue a bill of lading for property which it receives for transport, 49 U.S.C. Sec. 11707(a)(1)(1982). Liability runs from the issuer to the recipient of the bill of lading, id., and an action may be brought in United States District Court to enforce this liability, 49 U.S.C. Sec. 11707(d)(1)(1982). In 1978, Congress amended the jurisdictional grant in Section 1337 to require that suits brought under the Carmack Amendment have over $10,000 in controversy. Act of Oct. 20, 1978, Pub.L. No. 95-486, Sec. 9(a), 92 Stat. 1629, 1633-34. The amendment was in response to a flood of suits in the United States District Court for the District of Massachusetts brought under the Carmack Amendment, S.Rep. No. 117, 95th Cong., 2d Sess. 50, reprinted in 1978 U.S.Code Cong. & Ad.News 3569, 3613, which often involved "miniscule amounts" and forced the district court to function "as a clearinghouse for the negotiation and settlement of private debt," id. According to TICO, permitting Ford to maintain the present action on over 40,000 individual claims, each of which concern less than $10,000, would subject the federal courts to the exact type of suits which Congress sought to keep out in amending Section 1337(a). We disagree.
 
 
 20
 Section 10927 was passed to ensure the public that ICC certified motor carriers were independently financially responsible. See Carolina Casualty Insurance Co. v. Underwriters Insurance Co., 569 F.2d 304, 312 (5th Cir.1978); S.Rep. No. 1650, 83d Cong., 2d Sess. 1-2, reprinted in 1954 U.S.Code Cong. & Ad.News 2658, 2658. In contrast, "[t]he purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." Reider v. Thompson, 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950); Atlantic Coast Line Railroad Co. v. Riverside Mills, 219 U.S. 186, 200-01, 31 S.Ct. 164, 167-68, 55 L.Ed. 167 (1911). Due to the divergence of purposes between the Carmack Amendment and Section 10927, we are hesitant to interpret an amendment of one as affecting the jurisdiction of the other. See Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Commission, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968) ("repeals by implication are not favored" (footnote omitted)). Such an implied amendment is particularly inapt under the circumstances of the instant case since Congress in amending the Carmack Amendment in 1978 was focusing upon a particular perceived evil. See S.Conf.Rep. No. 1257, 95th Cong., 2d Sess. 9 (1978) ("The proposed substitute includes the so-called 'Carmack amendment provision' ... which narrows district court jurisdiction ... in certain Interstate Commerce Act cases." (emphasis added)). Congress had specifically determined that actions under the Carmack Amendment had increased the dockets of the federal court in Massachusetts by sixty-four percent. S.Rep. No. 117, supra, at 50. By contrast, neither party in this case has indicated that the federal courts are being inundated with suits brought pursuant to Section 10927. In fact, due to the regulations governing the damage claims of shippers, see 49 C.F.R. Secs. 1005.1-.7 (1985), an injured shipper will probably only initiate an action pursuant to Section 10927 in the rare instance in which the motor carrier becomes insolvent. We also draw support for our holding from the Seventh Circuit's recent decision in Kansas City Terminal Railway Co. v. Jordon Manufacturing Co., 750 F.2d 551 (7th Cir.1984). In Terminal Railway, the Seventh Circuit refused to extend the $10,000.00 amount in controversy requirement under the Carmack Amendment to a suit for unpaid freight charges. The court reasoned that such an extension of the amount in controversy requirement was contrary to the clear intent of Congress to limit this requirement to cases arising under the Carmack Amendment. Id. at 552. Based upon the foregoing, we hold that the 1978 amendment to Section 11707 in no way affects the ability of a party to bring suit under Section 10927.[7] Since we have subject matter jurisdiction over this action, we consider the propriety of the district court's grants of summary judgment.
 
 
 21
 IV. The Processed Claims.
 
 
 22
 The district court held that viewing the evidence in the light most favorable to TICO, no issue of material fact existed as to TICO's liability on the processed claims. See Fed.R.Civ.P. 56(c); SEC v. Blavin, 760 F.2d 706, 710 (6th Cir.1985) (per curiam). The district court reached its conclusion by applying Michigan surety law, see P.R. Post Corp. v. Maryland Casualty Co., 403 Mich. 543, 271 N.W.2d 521 (1978), and holding that ATI's processing of the damage claims created a prima facie case of liability against TICO. TICO asserts that the district court erred in so holding. We agree.
 
 
 23
 Initially, the district court's reliance on Michigan law was misplaced. The interpretation of the effect to be given the damage claims processed pursuant to the ICC regulations is a matter of federal law. See In re Yale Express System, Inc., 362 F.2d 111, 114(2d Cir.1966). Next, after carefully considering the purpose and structure of the ICC regulations pertaining to damage claims, we hold as a matter of federal law that a carrier's processing of claims pursuant to these regulations is not binding upon a carrier's insurer.
 
 
 24
 The ICC property loss regulations are very informal. A claim need only contain sufficient facts to identify the goods, assert liability, and ask for money damages. 49 C.F.R. Sec. 1005.2(b) (1985). Further, no formal hearing is held concerning the amount of the claim. Rather, after a prompt investigation of the claim, the motor carrier has the options of paying the claim, denying the claim, or making a firm compromise offer. 49 C.F.R. Sec. 1005.5(a)(1985). This informality and simplicity fosters the regulations' purpose to establish "principles and practices for the investigation and voluntary disposition of loss and damage claims ...," 49 C.F.R. Sec. 1005 (1985) (emphasis added), in a private, amicable manner.
 
 
 25
 In light of the purpose of the regulations, we are reluctant to give the settlements reached in accordance with these procedures the same effect as the district court. The giving of binding effect to the settlement amounts might undermine the entire regulatory scheme. Motor carriers fearful of prejudicing the rights of their surety insurance companies may become reluctant to readily settle claims. Conversely, the companies insuring the carriers in order to prevent the possible unfavorable settlement of claims may begin to mandate that all damage claims processed under the regulations meet their approval. Naturally, such actions would impair the regulations' efficacy by increasing the complexity and formality of the proceedings. Another reason for not giving the carrier's claims figures a binding effect is that the lack of a formal hearing renders the probative value of the amount of the claim paid extremely low. See Restatement of Security Sec. 139(3) (1941). Many claims may be settled just to avoid additional proceedings or to conform with a routine course of dealing. For the foregoing reasons, we hold that the amount of a claim processed pursuant to the ICC regulations is not binding upon a carrier's insurer. Accordingly, the district court erred in holding that ATI's processing of the damage claims created a prima facie case against TICO.[8]
 
 
 26
 Although our holding on this issue alone requires reversal, in the interests of judicial economy we also consider the district court's holding concerning TICO's defenses. Three-and-one-half years into the litigation of this case TICO asserted for the first time that some of Ford's damage claims were subject to set-off by the amounts other carriers had agreed to pay ATI under the pro rata agreements, barred by the nine month filing requirement of the Uniform Bill of Straight Lading, and outside the coverage of the B.M.C. 32 endorsement. The district court, although finding merit in TICO's defense that some of the claims fell outside of the scope of the B.M.C. 32 endorsement, held that all three defenses were "affirmative defenses" which had been waived by TICO's failure to plead them.
 
 
 27
 An affirmative defense raises matters extraneous to the plaintiff's prima facie case; as such, they are derived from the common law plea of "confession and avoidance." 5 C. Wright & A. Miller, Federal Practice & Procedure Sec. 1270, at 289 (1969). On the other hand, some defenses negate an element of the plaintiff's prima facie case; these defenses are excluded from the definition of affirmative defense in Fed.R.Civ.P. 8(c). 2A J. Moore & J. Lucas, Moore's Federal Practice paragraphs 8.27, 8.27 (2d ed. 1985). Although sometimes difficult to discern, the distinction between the two categories of defenses is crucial since affirmative defenses are generally waived if not plead. Fed.R.Civ.P. 8(c); see TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 547 (6th Cir.1981). In determining whether a defense is an affirmative one, the starting point should be the list of affirmative defenses in Rule 8(c). A defense analogous to or a derivative of one of the listed defenses should generally be deemed an affirmative defense. A second major consideration is the fairness of allowing the defendant to assert the defense; if permitting the defendant to interpose the defense will force the plaintiff to perform additional discovery or develop new legal theories, these considerations will militate heavily in favor of terming the defense affirmative. See Huszar v. Cincinnati Chemical Works, Inc., 172 F.2d 6, 9 (6th Cir.1949); Carr v. National Discount Corp., 172 F.2d 899, 903 (6th Cir.), cert. denied, 338 U.S. 817, 70 S.Ct. 59, 94 L.Ed. 495 (1949). We consider TICO's defenses in light of these considerations.
 
 
 28
 We agree with the district court that TICO's attempt to interpose the potential liability of other carriers based on the pro rata agreements was inappropriate at such a late date. The fact that ATI may have a cause of action against other carriers for a portion of Ford's damage claims in no way effects TICO's liability to Ford under the B.M.C. 32 endorsement. Because the B.M.C. 32 endorsement creates a surety relationship, see Yale Express, 362 F.2d at 114, Ford may treat TICO as the primary obligor. Restatement of Security Sec. 82 comment f (1941) ("So far as the creditor is concerned, the surety may be the primary obligor."). Moreover, TICO's establishing of this defense would require additional, collateral litigation concerning the interpretation and application of the pro rata agreements.
 
 
 29
 TICO's defense that some of Ford's claims are barred by the nine month filing period of the Uniform Bill of Straight Lading would appear, at first blush, to be equivalent to a statute of limitations defense and hence precluded by TICO's failure to assert it in a timely fashion. See Colonial Refrigerated Transportation, Inc. v. Worsham, 705 F.2d 821, 826 (6th Cir.1983). A time limitation on the bringing of an action, however, must undergo a second level of scrutiny to determine if it is an affirmative defense. The time period must be analyzed to determine whether it acts as a condition to the continued existence of the cause or, like a classic statute of limitations, as a bar to bringing the suit. See Goodwin v. Townsend, 197 F.2d 970, 971 (3d Cir.1952). If the limitations period acts as a condition precedent to the suit, the defense falls outside the ambit of Rule 8(c) since it is equivalent to an element of the cause of action. See Emmons v. Southern Pacific Transportation Co., 701 F.2d 1112, 1117-18 (5th Cir.1983). The nine month filing provision of the Uniform Bill of Straight Lading at issue emanates from 49 U.S.C. Sec. 11707(e)(1982), which provides that "[a] carrier may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim...." This Court has held that compliance with the requirements of the predecessor to Section 11707(e), 49 U.S.C. Sec. 20(11)(1976), repealed by Revised Interstate Commerce Act, Pub.L. No. 95-473, Sec. 4(b), 92 Stat. 1337, 1454 (1978), are prerequisites to the bringing of an action under the bill of lading and are not subject to waiver or estoppel. B.A. Walterman Co. v. Pennsylvania Railroad Co., 295 F.2d 627, 628 (6th Cir.1961) (per curiam). Thus, unlike a typical statute of limitations defense, the nine month filing requirement of the Uniform Bill of Straight Lading is an element of the cause of action. Accordingly, this defense is not an affirmative one within Rule 8(c) and TICO should be permitted on remand to interpose the issue of whether Ford complied with the nine month limitation period.[9]
 
 
 30
 A similar situation is presented by TICO's defense that it is not liable for those damage claims which fall outside of the coverage of the B.M.C. 32 endorsement, specifically, those claims arising from damage which occurred solely in intrastate commerce and in exempt zones, see 49 U.S.C. Sec. 10526(b)(1) (1982). It is axiomatic that for Ford to recover under the B.M.C. 32 endorsement the endorsement by its terms must be applicable to the transaction; if TICO can establish that a claim falls outside the coverage of the B.M.C. 32 endorsement, Ford will be unable to establish its prima facie case. By definition, therefore, TICO's defense is not an affirmative one. Also, Ford will not have to engage in supplementary discovery to meet this defense since Ford should be well aware from its own records where the damages were incurred and the details of the transactions underlying its claims. Accordingly, we hold that TICO's defense that some of the claims fall outside of the scope of the B.M.C. 32 endorsement is not an affirmative defense within the definition of Rule 8(c) and, accordingly, on remand, TICO should be given an opportunity to establish this defense.[10] Last, we consider the district court's granting of summary judgment on the unprocessed claims.
 
 
 31
 V. The Unprocessed Claims.
 
 
 32
 The district court began its analysis of the unprocessed claims by noting that although ATI had failed to process Ford's claims in accordance with the ICC regulations on damage claims, 49 C.F.R. Sec. 1005.1-7 (1985), the regulations provided Ford with no remedy for TICO's noncompliance. The district court sought to fill this gap by applying Bankruptcy law by analogy, 11 U.S.C. Sec. 502(a), (b) (1982). The district court treated the hearing held on Ford's motion for summary judgment as the hearing specified by Section 502(b).[11] The "hearing" resulted in a determination that Ford should receive eighty percent of the total amount of unprocessed claims because ATI ostensibly had historically approved this percentage of claims. The district court reasoned that this action was necessary to encourage the efficient resolution of damage claims. Although we appreciate the district court's desire to encourage the efficient resolution of claims and understand its frustration with this protracted litigation, we are constrained to hold that the district court's handling of this matter was improper.
 
 
 33
 As previously discussed, the ICC regulations governing damage claims are informal and flexible. The implication of a remedy into the failure to comply with these regulations would be directly contrary to these aspects of the regulatory scheme. More importantly, Congress has given the ICC the authority to prescribe regulations on these matters, 49 U.S.C. Sec. 10321(a) (1982), and the ICC is in the best position to determine if the regulations' efficacy would be enhanced by penalty provisions. Hence, we refuse to judicially imply a remedy into the regulatory scheme.
 
 
 34
 Once this matter is resolved, as acknowledged by the district court's opinion, several issues of material fact exist. The total amount of the unprocessed claims is disputed and the eighty percent adjustment applied to each claim is simply not supported by any evidence in the record. Also, the unprocessed claims, like the processed claims, would be subject to TICO's defense that the claims were either barred by the Uniform Bill of Straight Lading's nine month filing requirement or fell outside the scope of the B.M.C. 32 endorsement. Accordingly, we reverse the district court's granting of summary judgment on the unprocessed claims in Ford's favor.
 
 
 35
 For the foregoing reasons, the judgment of the district court is reversed and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Former defendant Central National Insurance Company (CNI) insured TICO from February to September 1979. Ford's claims against CNI have been settled
 
 
 [2]
 The B.M.C. 32 endorsement provides in the relevant portion as follows:
 In consideration of the premium stated in the policy to which this endorsement is attached, the Company hereby agrees to pay, within the limits of liability hereinafter provided, any shipper or consignee for all loss of or damage to all property belonging to such shipper or consignee, coming into the possession of the insured in connection with such transportation service, for which loss or damage the insured may be held legally liable, regardless of whether the motor vehicles, terminals, warehouses, and other facilities used in connection with the transportation of the property hereby insured are specifically described in the policy or not. The liability of the Company extends to such losses or damages whether occurring on the route or in the territory authorized to be served by the insured or elsewhere.
 Within the limits of liability hereinafter provided it is further understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement by the insured, shall affect in any way the right of any shipper or consignee, to relieve the Company from liability for the payment of any claim arising out of such transportation service for which the insured may be held legally liable to compensate shippers or consignees, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company. The insured agrees to reimburse the Company for any payment made by the Company on account of any loss or damage involving a breach of the terms of the policy and for any payment that the Company would not have been obligated to make under the provisions of the policy, except for the agreement contained in this endorsement.
 
 
 [3]
 At a subsequent hearing on the unprocessed claims, the district court was informed that $17,145.26 of the processed claims had been inexplicably "lost" by the auditors. The final judgment was reduced by this amount. See infra note 6
 
 
 [4]
 This motion by TICO was all the more remarkable since TICO had admitted the existence of subject matter jurisdiction in its initial removal petition to the bankruptcy court. Nevertheless, subject matter jurisdiction by its very nature cannot be agreed to and may be raised at any time
 
 
 [5]
 This figure represents approximately 80% of the $655,693.56 worth of unprocessed claims Gould averred to in his affidavit. In calculating the final judgment the district court applied the $655,693.56 figure. See infra note 6
 
 
 [6]
 The district court apparently reached this figure by adding the $1,708,206.73 of the processed claims, see supra note 3, with 80 percent of $655,693.56, see supra note 5, or $524,554.85, of the unprocessed claims
 
 
 [7]
 The foregoing disposition renders it unnecessary for us to consider the correctness of the district court's other three jurisdictional holdings
 
 
 [8]
 On appeal, TICO asserts that James Gould erred in calculating the amount of processed claims. TICO, however, failed to raise this issue in either its motion in response to Ford's motion for summary judgment on the processed claims or at the hearing on Ford's summary judgment motion. Moreover, TICO admitted in its response to Ford's motion that it had failed to check Gould's calculations. Under these circumstances, we hold that TICO waived its right to review on this issue. Fed.R.Evid. 103(a)(1); see Helminski v. Ayerst Laboratories, 766 F.2d 208, 211 (6th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985)
 
 
 [9]
 We also reject the district court's alternative holding that Ford's right to recover under the B.M.C. 32 endorsement was independent of and not affected by the bills of lading. TICO's liability as a surety is defined by the B.M.C. 32 endorsement. See Restatement of Security Sec. 82 comment g ("Suretyship obligations are contractual, and the important point of inquiry should be the precise undertaking of the surety...."). In this case, the endorsement binds TICO to pay all damage claims for which ATI "may be held legally liable." ATI's legal liability to Ford is apparently solely premised upon the bills of lading. See 49 U.S.C. Sec. 11707 (1982). Consequently, a determination that Ford has not complied with the Uniform Bill of Straight Lading will absolve ATI of liability and concomitantly exonerate TICO of its surety obligation under the plain terms of the B.M.C. 32 endorsement
 
 
 [10]
 Both parties have presented arguments concerning the scope of the B.M.C. 32 endorsement. We note that the ICC's authority to promulgate the B.M.C. 32 endorsement is grounded on 49 U.S.C. Sec. 10521(a)(1) (1982). See 49 U.S.C. Secs. 10927(a)(3), 10922(b)(1), 10521(a) (1982). This Court has interpreted the predecessor to Section 10521(a)(1), 49 U.S.C. Sec. 303(a)(10) (1976), repealed by Revised Interstate Commerce Act, Pub.L. No. 95-473, Sec. 4(b), 92 Stat. 1337, 1466 (1978), as extending to those activities " 'part of a continuous movement in interstate commerce.' " Baird v. Wagoner Transportation Co., 425 F.2d 407, 410 (6th Cir.) (quoting Shew v. Southland Corp. (Cabell's Dairy Division), 370 F.2d 376, 380 (5th Cir.1966)), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970)
 
 
 [11]
 Ford in its brief asserts that the district court had the power to apply bankruptcy law due to the consolidation of its bankruptcy counterclaim and the district court proceedings. This argument is meritless. Chapter 5 of the Bankruptcy Act only applies to cases under Chapters 7, 11, or 13 of the Bankruptcy Act. 11 U.S.C. Sec. 103(a) (1982). In this case, the bankruptcy judge explicitly abstained from taking jurisdiction over any of these actions and remanded the proceedings back to the district court. 11 U.S.C. Sec. 305(a) (1982); 28 U.S.C. Sec. 1471(c) (1982). Chapter 5 of the Bankruptcy Act, therefore, has no applicability, except by analogy, to the present case