**TOLEDO–LUCAS COUNTY PORT AUTHORITY, et al., Plaintiffs,**

v.

**AXA MARINE & AVIATION INSURANCE (UK) LTD., et al., Defendants.**

No. 3:99CV7320.

United States District Court, N.D. Ohio, Western Division.

Sept. 4, 2002.

Janine T. Avila, Steven R. Smith, William M. Connelly, Connelly, Jackson & Collier, M. Charles Collins, Robert J. Gilmer, Jr., Eastman & Smith, Toledo, OH, for Plaintiffs.

Jack C. Hsu, Kirsten L. Radler, Mark E. Christensen, Christensen & Ehret, Chicago, IL, Daniel F. Marinik, Baran Piper Tarkowsky Fitzgerald & Theis, Richard M. Kerger, Kerger & Kerger, Toledo, OH, Robert S. Marshall, Bates & Carey, Chicago, IL, for Defendants.

David W. Zoll, Zoll & Kranz, Toledo, OH, for Defendants.

ORDER

CARR, District Judge.

This is an insurance coverage case in which plaintiffs claim defendants wrongfully denied coverage for the defense and settlement of lawsuits brought against the • Toledo–Lucas County Port Authority ("the Port Authority"). This court has jurisdiction pursuant to 28 U.S.C. § 1332. Pending are defendants' 12(b)(1) motion and motions for summary judgment, seeking to

dismiss plaintiffs' claim of bad faith. For the following reasons, defendants' motions shall be granted.

### Background

In 1994, the London Companies [1] issued to the Port Authority a Ports Liability Policy ("the Policy") for a policy period of May 22, 1994 through May 22, 1995. Through the Policy, the London Companies provided primary coverage for liabilities on account of bodily injury, personal injury, property damage, and advertising liability. Additionally, the Policy provided claims-made coverage for public officials liability.

The Port Authority also purchased a policy from Coregis Insurance Company (Coregis) that provided coverage, including coverage for public officials liability, in excess of the primary coverage provided by the London Companies.

On July 24, 1994, a lawsuit was brought in connection with the Port Authority's operation of the Toledo Express Airport in the Court of Common Pleas for Fulton County, Ohio. The lawsuit alleged that Burlington Air Express, an air freight carrier induced by the Port Authority to operate at the airport, caused excessive and harmful noise. Subsequently, from July 20, 1994 to April 6, 1998, ten more suits alleging harm in relation to excessive noise caused by the operation of Burlington Air Express were filed (collectively, "the Airport Claims"), in both Fulton and Lucas Counties, Ohio. Several of these suits alleged claims of fraud in connection with the operation of Burlington Air Express against individual Port Authority employees.

On July 28, 1994, the Port Authority requested a determination by the London Companies of coverage under the Policy, including coverage under the public officials liability provision. On August 15, 1994, the London Companies responded with a denial of coverage because "there is no coverage as respects airport activities under these policies." (Doc. 217 Ex. 1 & 2).

In orders filed August 7, 1995, February 8, 1996, in the Courts of Common Pleas of Lucas and Fulton Counties, respectively, all claims against individual Port Authority employees were dismissed for failure to state a claim.

On May 21, 1999, the Port Authority filed this coverage action against the London Companies seeking declaratory judgment and monetary damages. On July 1, 1999, the London Companies agreed to pay defense costs incurred by the Port Authority during the time period of July 28, 1994 through February 6, 1998. The London Companies paid these costs in full on February 15, 2000.

The Airport Claims were eventually settled for $4.6 million. The Port Authority paid all its attorneys' fees subsequent to February 6, 2000, and $1.15 million of the settlement. Coregis paid the remaining $3.45 million of the settlement. In the amended complaint, Coregis joined this suit as a party plaintiff. Plaintiffs seek defense costs and settlement expenses from the London Companies. Additionally, plaintiffs brought a claim of bad faith on the part of the London Companies.

In a May 9, 2001 Order, this court entered partial summary judgment in favor of the London Companies on the coverage claim, finding that the Companies had no obligation to cover the settlement or additional defense costs.

The May 9th Order, without addressing the merits of the bad faith claim, directed

---

1. The insurance policy in this case was issued by a group of insurers, the defendants, collectively referred to as the London Companies.

that the case be closed. That directive was inadvertent, and on July 4, 2001, the case was reopened for briefing on the bad faith claim.

The London Companies have moved this court to dismiss plaintiffs' bad faith claim in three separate motions: 1) motion for summary judgment to dismiss the Port Authority's bad faith claim for lack of coverage under the Policy (Doc. 207); 2) a 12(b)(1) motion and motion for summary judgment to dismiss Coregis' bad faith claim (Doc. 205); and 3) motion for summary judgment to dismiss plaintiffs' bad faith claim under the statute of limitations (Doc. 220).

For the following reasons, the first and second motions shall be granted. Because of my decisions with respect to the first two motions, I need not, and will not, address the London Companies motion relating to the statute of limitations.

### Discussion

### I. The Port Authority's Bad Faith Claim

■ The London Companies argue that the Port Authority cannot maintain a cause of action for bad faith because there was no coverage in the first instance under the Policy where the Airport Claims alleged employee conduct outside the scope of the employees' discretionary duties.[2] I agree.

The Policy reads:

The words "Public Officials Liability", wherever used herein, shall mean any actual or alleged act, error, misstatement, neglect, omission and/or breach of duty (including but not limited to, misfeasance, malfeasance and/or non-feasance) by an officer and/or commissioner and/or employee and/or committee member *in the discharge of his/her duties as such* and claimed against him/her solely by reason of his/her capacity as such with a port or harbor commission named herein.

Doc. 210, Ex. 3 at 4, ¶ I.6 (emphasis added).

Thus, the triggering of coverage for Public Officials Liability requires that the employee's act be committed "in the discharge of his/her duties as an employee."

The Airport Claims alleged that:

At all times herein referred to, the PA [Port Authority] Employees, in taking the action described herein, acted recklessly, willfully, and wantonly, *and outside the scope of their discretionary duty and responsibility.*

Doc. 210, Ex. 5, *McQuade* Complaint, ¶ 67 (emphasis added).[3] Because the Airport

---

2. The Port Authority argues that the London Companies cannot assert a new ground for denying coverage. The Port Authority contends that this is an affirmative defense—a defense based on an exclusion or exception to the insurance policy—that the London Companies waived by failing to raise previously. *See Ford Motor Co. v. Transport Indemnity Co.,* 795 F.2d 538, 546 (6th Cir.1986) (stating that "affirmative defenses are generally waived if not plead," citing Fed.R.Civ.P. 8(c)). The London Companies' defense, however, seeks to negate an element of the Port Authority's *prima facie* case, and, therefore, is excluded from the definition of affirmative defense in Fed.R.Civ.P. 8(c). *Id.* ("[S]ome defenses negate an element of the plaintiff's

*prima facie* case; these defenses are excluded from the definition of affirmative defense in Fed.R.Civ.P. 8(c)"). Consequently, I find that the London Companies have not waived this defense to coverage.

3. The *Howard, Calabrese, Miller, Biler, Biglow* (Doc. 210, Ex 5 at ¶ 54), *Tomaszewski,* and *Denecs (Id.* at ¶ 46) Complaints alleged: "At all times herein referred to, the PA Employees, in taking the action described herein, acted fraudulently, recklessly, willfully, and wantonly, negligently, *and outside the scope of their discretionary duty and responsibility."* (emphasis added). The *Studer, Gunther,* and amended *Kagy* Complaints did not allege claims against individual Port Authority employees. *Id.*

Claims did not allege conduct by a Port Authority employee "in the discharge of his/her duties," these claims did not trigger coverage under the Policy. Thus, there was never any coverage under the Policy for the claims against Port Authority employees.

The Port Authority concedes that the Airport Claims may have alleged conduct that was outside the scope of its employees' duties, and, therefore, not covered by the Policy. The Port Authority contends, however, that the allegations of recklessness on the part of the its employees were sufficient to trigger coverage, and that it was improper for the London companies to deny coverage simply because other, noncovered claims were also plead. *See Insurance Co. of N. America v. Travelers Ins. Co.*, 118 Ohio App.3d 302, 313, 692 N.E.2d 1028 (1997) (holding that an insurer is obligated to defend a claim that "potentially" may be cover under a policy).

The Port Authority's argument, however, ignores the plain language of the Airport Claims, which alleged that Port Authority employees "acted recklessly ... *and* outside the scope of their discretionary duty." (Emphasis supplied). The use of the word "and" indicates that the allegedly reckless employee conduct was outside the scope of the employees' discretionary duties. Thus, based on the plain and unambiguous language of both the Policy and the Airport Claims, I find that there has never been coverage under the Policy for the Public Officials Liability alleged in the Airport Claims, including the allegations of recklessness.[4]

As a result of this lack of coverage, the London Companies assert that "[b]ecause there was no coverage in the first instance for Public Officials Liability under the 1994 Policy for the Airport Claims, no duty of good faith can be derived from the Policy for the handling and payment of these claims, and no action for bad faith is sustainable against the London Companies." (Doc. 213 at 7). The Port Authority, however, argues that "under Ohio law, a bad faith claim is cognizable even in the absence of coverage." (Doc. 217 at 15). The London Companies disagree claiming that, under Ohio law, a cognizable bad faith claim presupposes that an insured is entitled to coverage in the first instance.

It is well-established in Ohio that "an insurer has a duty to act in good faith in the processing and payment of the claims of its insured." *Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298, 302, 525 N.E.2d 783 (1988). In Ohio "an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 554, 644 N.E.2d 397 (1994).

The Ohio Supreme Court has never considered whether an insured may bring a claim of bad faith in the absence of coverage. Several Ohio appellate courts have addressed this issue, and their decisions are not are not "to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the state would decide other-*

---

4. In a footnote, the Port Authority argues that the London Companies' interpretation of the Policy effectively eliminates all coverage under the Policy for a public official's wrongdoing, and, therefore, renders such insurance coverage pointless. In the text of its argument, however, the Port Authority explicitly recognizes that, if the Airport Claims had alleged only that the Port Authority employees

were acting "recklessly," the employees would have lacked immunity under the Ohio Revised Code and coverage would have been available under the Policy. Doc. 217 at 14. Thus, as the Port Authority concedes, at least one type of claim might have existed that would fall under the Policy. The Airport Claims, however, did not assert such a claim.

*wise.'" Grantham & Mann. Inc. v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir.1987) (citations omitted) (emphasis in original).

In *Bob Schmitt Homes, Inc. v. The Cincinnati Ins. Co.*, No. 75263, 2000 WL 218379 (Feb. 24, 2000) (unreported), an insured appealed the entry of summary judgment in favor of its insurer on a claim of bad faith. The insured argued that the "an insured may maintain an action for bad faith against its insurer without having to show that it is entitled to coverage under the policy." *Id.* at *3. The appeals court found no merit in this contention, holding that "[t]he rule announced in *Zoppo* presupposes that the insured is entitled to coverage in the first instance." *Id.* at *4. Because the insured had failed to show that it was entitled to coverage under the underlying insurance policy and, therefore, "the initial factual prerequisite to [a bad faith] claim [was] lacking," the court held that summary judgment was appropriate. Id.

In *Buckeye Union Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 1997 WL 180278 (April 16, 1997), another case in which an insured appealed the entry of summary judgment in favor of its insurer on a claim of bad faith, the appeals court held that summary judgment was properly entered because the insurer owed the insured "no duty of good faith and fair dealing which it might have breached." *Id.* at *6.

In reaching this conclusion, the court noted that "[t]he duty of good faith and fair dealing arises by virtue of, and thus exists solely because of, the contractual relationship between the insurer and its insured" *Id.* at *4 (citing *Hoskins v. Aetna*

*Life Ins. Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315 (1983); *Eastham v. Nationwide Mut. Ins. Co.*, 66 Ohio App.3d 843, 846–847, 586 N.E.2d 1131 (1990)). The court determined that there was no coverage in the first instance under the underlying policy, and, therefore the "contractual relationship" between the insured and insurer had not been implicated. *Id.* at *6. Consequently, the court held that "[i]n the absence of a contractual relationship between" the insured and insurer, "the law imposed upon [the insured] no duty of good faith and fair dealing," which the insured might have breached.[5] Id.

The Port Authority responds by citing *Bullet Trucking, Inc. v. Glen Falls Ins. Co.*, 84 Ohio App.3d 327, 616 N.E.2d 1123 (1992), in which the insured appealed an entry of summary judgment in favor of the insurer dismissing claims of breach of contract and bad faith. The appeals court affirmed the lower court's dismissal of the insured's breach of contract claim because the insured had failed to bring suit within a two-year period of limitations prescribed in the underlying insurance policy. *Id.* at 332, 616 N.E.2d 1123.

The appeals court, however, rejected the insurer's argument that "the trial court's decision to grant summary judgment on the [bad faith] claim was not in error because it is axiomatic that to succeed on the tort claim for a breach of the duty to act in good faith, the insured must succeed on the underlying contract claim." *Id.* at 333, 616 N.E.2d 1123. The court noted that "the tort of bad faith is an independent claim which does not necessarily rely on a breach of contract claim for its existence." *Id.* Thus, the court held that the grant of summary judgment on the in-

---

5. In its opinion, the appeals court assumed that the insured had created issues of fact going to whether the insurer had acted reasonably in relation to the insured. Nevertheless, the court found that its decision that the

insured owed no duty of good faith to the insured in the first instance rendered "immaterial any factual issues relevant to the issue of whether [the insurer] breached such a duty." *Buckeye Union*, at *4.

sured's contract claim did not prevent the insured from asserting its bad faith claim.

In dicta, the court noted that there are two types of bad faith claims: "when an insurer breaches its duty of good faith by intentionally refusing to satisfy an insured's claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal." *Id.* at 334, 616 N.E.2d 1123.[6] The court determined that, while the first type of bad faith claim requires proof of a breach of the insurance contract, the second type of bad faith claim—failure to investigate—needs no such proof. The Port Authority contends that, under *Bullet*, it need not establish coverage under the Policy to maintain its bad faith claim, at least to the extent that the Port Authority argues failure to investigate on the part of the London Companies.

I am, however, unpersuaded by the Port Authority's reliance on *Bullet*, finding that the case is not on-point. In *Bullet*, the court addressed the issue of whether an insured must succeed on its breach of contract claim in order to maintain a bad faith claim. This issue, however, is separate and distinct form the issue raised here: namely, whether coverage must exist in the first instance in order to maintain a bad faith claim.

The court in *Buckeye Union* illustrated this distinction well. After concluding that an insured could not bring a bad faith claim when there was no coverage in the first instance, the court explicitly stated:

Our holding here should not be misconstrued to require proof of the insurer's breach of an express contractual provision to maintain an action for the breach of the implied duty of good faith and fair dealing. An insurer's breach of the duty gives rise to a cause of action in tort, irrespective of any liability that might arise from a breach of the underlying insurance contract.

*Buckeye Union*, at *7 (citing *Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298, 525 N.E.2d 783 (1988)).

Moreover, the *Bullet* decision has been criticized by another Ohio court. In *Pasco v. State Auto. Mut. Ins. Co.*, 1999 WL 1221633, at *7 (Dec. 21, 1999) (unreported), an appeals court affirmed a trial court's decision to dismiss an insured's bad faith claim. The trial court had ruled that the bad faith claim could not be maintained because "an insurer has no obligation to pay or settle a claim for which the policy does not provide coverage." *Id.* at *2. In affirming, the court rejected the insured's assertion, based on *Bullet*, that an insured need not establish coverage to maintain a bad-faith failure to investigate claim against its insurer. *Id.* at *4. The court found the case "unpersuasive," and lacking in any authority to support its contentions. Id.

 In light of *Bob Schmitt Homes, Buckeye Union*, and *Pasco*, I find that the Ohio Supreme court would likely hold that an insured may not maintain a claim of bad faith in the absence of coverage under the policy.[7] Thus, summary judgment in favor

---

6. In articulating this standard, the court in *Bullet* was quoting the Ohio Supreme Court's decision in *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 590 N.E.2d 1228 (1992). The Ohio Supreme Court, however, subsequently has overruled the *Said* decision, rejecting intent as an element of the tort of bad faith in favor of a "reasonable justification" standard. *Zoppo*, 71 Ohio St.3d at 554–55, 644 N.E.2d

397 ("The *Said* decision was an aberration that failed to follow clearly established precedent.").

7. The Port Authority cites authority from other jurisdictions to support its claim that an insured may maintain a bad faith claim in the absence of coverage in the first instance. I find these cases unpersuasive. The majority

of the London Companies is appropriate in this case because the Port Authority has failed to show that it was entitled to coverage under the Policy in the first instance.

## II. Coregis' Bad Faith Claim

In the amended complaint, Coregis, the Port Authority's excess insurance carrier, also asserts a claim of bad faith against the London Companies. Coregis alleges bad faith on the part of the London Companies through the Companies' refusal to pay for the settlement of the Airport Claims and any additional defense fees and legal expenses. The London Companies argue, however, that Coregis lacks standing to sue for bad faith because Coregis was not a party to the Policy and has not been assigned or subrogated into the rights of the Port Authority (the insured).

Coregis disagrees, arguing that it is subrogated into the rights of the Port Authority, and, therefore, fully possesses standing to bring a bad faith claim against the London Companies. To support its contention, Coregis relies on the Ohio Supreme Court's decision in *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 62 Ohio St.2d 221, 404 N.E.2d 759 (1980), in which the

court held "that an excess insurer is subrogated to the insured's rights against a primary insurer and may maintain an action for breach of the primary carrier's good faith duty to settle and defend." Thus, Coregis argues that, because it is an excess insurer, it may maintain a bad faith action against the London Companies.

The London Companies, however, contend that Coregis reads *Centennial* much too broadly, and argue that Coregis' status as an excess insurer does not, in and of itself, subrogate it into the Port Authority's rights against the London Companies. I agree. As the London Companies state, "*Centennial* merely re-affirms that subrogation exists in the insurance context", and "[t]he case is neither concerned with, nor does it explain, the elements necessary for one to become subrogated into the rights of a third party against another." Doc. 231 at 7.

In Ohio, "Legal subrogation is an equitable doctrine derived from the civil law," and "is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter."

---

of the cases cited by the Port Authority fail to address the issue presented in this case, and merely stand for the proposition that an insured need not prove breach of the insurance contract to maintain a bad faith claim, which is not an issue in this case. *See Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*, 942 F.Supp. 1018, 1020 (E.D.Pa.1996) (holding that a "plaintiff may succeed on its bad faith claim even if it fails on the underlying breach of contract claim"); *Svedala Indus., Inc. v. The Home Ins. Co.*, 921 F.Supp. 576, 579 (E.D.Wis.1995) (stating that the "tort of bad faith is not a tortious breach or contract; it is a separate intentional wrong which derives from the relationship of the parties under the contract"); *Tadlock Painting Co. v. Maryland Cas. Co.*, 322 S.C. 498, 504, 473 S.E.2d 52 (1996) ("[W]e decline to make breach of an express contractual provision a prerequisite to bringing the action.").

One of the cases cited by the Port Authority does lend some support to its position, *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338 (Tex. 1995). In that case, the Texas Supreme Court stated "[w]e do not exclude, however, the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim." *Id.* at 341. The court, however, made this statement in dicta, and only after holding that "[t]he [insured] cannot preclude [the insurer] from relying on a reason for denying their claim that existed at the time, even if it was not the reason [the insurer] gave." *Id.* In any event, I find this case, alone, is not sufficient to persuade me that, in Ohio, an insured may maintain a bad faith action in the absent coverage in the first instance.

*American Ins. Co. v. Bureau of Workers' Comp.*, 62 Ohio App.3d 921, 924, 577 N.E.2d 756 (1991) (citations omitted); *see also Maryland Cas. Co. v. Gough*, 146 Ohio St. 305, 315, 65 N.E.2d 858 (1946). The doctrine "shifts a loss from one merely secondarily liable on a debt to one more primarily liable on the debt who in equity should have paid it in the first instance." *American Ins. Co.*, 62 Ohio App.3d at 924, 577 N.E.2d 756. Thus, legal subrogation arises in circumstances where a party pays or covers an obligation for which another is primarily responsible but did not pay or discharge.

The facts of *Centennial* conform to this general principle. In that case, the primary insurer had an opportunity to settle a claim against its insured within policy limits, but did not settle. The case went to trial and the jury returned a verdict in excess of the settlement offer. The insured's excess insurer paid a portion of the jury verdict, and then brought a bad faith action against the primary insurer for failing to settle within policy limits.[8]

Thus, as the London Companies argue, and I agree, "it was not the [excess insurer's] mere status as an excess carrier that subrogated it into the rights of the insured," but, rather, it was the fact that the excess insurer covered an obligation for which the primary insurer was responsible. Doc. 231 at 8.

█ In the case at hand, Coregis did not pay or cover an obligation for which the London Companies were responsible. Coregis covered a substantial portion of the settlement. The London companies were not, however, responsible or obligated in any way to pay this obligation. *See* Doc. 180 at 7, the May 9, 2001 Order. Because Coregis covered an obligation for which the London Companies were not responsible, I find that Coregis is not subrogated into the rights of the Port Authority. Consequently, Coregis has no standing to maintain its claim of bad faith against the London Companies.

Even if Coregis had standing, I would still dismiss its bad faith claim for the same reasons as the Port Authority's bad faith claim—there was no coverage under the policy in the first instance. For the reasons stated earlier, without coverage in the first instance, an insured (or an excess insurer subrogated into its rights) can not maintain a bad faith action against its insured under Ohio Law.

### Conclusion

It is, therefore,

**ORDERED THAT** the London Companies' motions for summary judgment and its motion to dismiss be, and the same hereby are granted.

**So ordered.**

---

8. The excess insurer also claimed that the primary insurer's attempts to receive contribution from the excess insurer during settlement negotiations evidenced bad faith.